**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal Case No. 1:18-cr-00036-RDM** |
| **v.** | : | |
| | : | |
| **WILLIAM PATRICK SYRING,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES SENTENCING MEMORANDUM**

The United States of America, by and through its undersigned counsel, respectfully files this Sentencing Memorandum as an aid to the Court. The defendant stands before the Court convicted of threatening seven employees of a local non-profit. Cruelly playing on fears he created years before, he sought to stop them from their peaceful public advocacy, community organizing, and democracy building efforts by sending the terrifying message that they would be "cleansed" based solely on their heritage or the heritage of those they sought to help. Despite warnings spanning many years from the Court, Probation, his own family and the government, the defendant's hatred, bigotry and sense of his own entitlement overruled all reason. He took pleasure in toying with the victims - picking and choosing messages and images designed to terrify them while claiming refuge behind our country's dearest principles. A jury soundly rejected his scheme.

Perhaps most importantly, the defendant was not dissuaded, and the victims were left unprotected, despite the defendant's prior incarceration for the nearly identical offense, committed in the nearly identical way, toward the nearly identical people in the face of his admissions that his chosen defense was empty. He has proven beyond a shadow of a doubt that he won't be rehabilitated, reformed, or re-educated. As the victim impact statements and their testimony attest, the defendant has had a damaging and lingering effect on their lives and the lives of their families.

1

He may take some satisfaction that he accomplished his goals of tormenting the victims, but he should take that satisfaction from behind prison walls for as long as the sentencing guidelines reasonably allow.  As such, the government agrees with the United States Probation Office (USPO) that the defendant's total offense level is 28 and the criminal history category is II, resulting in a Guidelines recommendation of 87 to 108 months. *See* Draft Presentence Investigation Report, Dkt. at 119. A Guidelines sentence is appropriate in this case.

## I.      Stalking is the appropriate cross-reference for Counts One through Seven.

The defendant was convicted in Counts One through Seven of civil rights offenses involving the sending of threats to AAI employees to willfully intimidate or interfere with their employment, in violation of 18 U.S.C. § 245.  Violations of § 245(b) fall under U.S.S.G § 2H1.1, Offenses Involving Individual Rights. *See* § 2H1.1, *Commentary*; *see also United States v. Allen*, 341 F.3d 870, 894 (9th Cir. 2003). Section 2H1.1(a) provides that courts should "apply the greatest" base offense level of (1) "the offense level from the offense guideline applicable to any underlying offense;" or (2) "10, if the offense involved "the use or threat of force against a person." In this regard, § 2H1.1 "provides a floor, not a ceiling." *United States v. Byrne*, 435 F.3d 16, 27 (1st Cir. 2006). Application Note 1 of this section defines "offense guideline applicable to any underlying offense" to mean "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law (other than an offense that is itself covered under Chapter Two, Part H, Subpart 1)."

In determining the proper offense level in § 2H1.1(a)(1), courts should consider "all acts and omissions committed . . . by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). Additionally, courts need only determine by a preponderance of the evidence that the defendant's conduct constitutes an offense under federal, state, or local law. *See United States v. O'Brien,* 560 U.S. 218, 224 (2010) ("Sentencing factors . . . can be proved to a judge at sentencing by a preponderance of the

evidence."); *see also* U.S.S.G. § 6A1.3, Commentary.

For example, the Seventh Circuit in *United States v. Cozzi*, found that the district court correctly applied the sentencing guidelines in cross-referencing § 2A.2, Aggravated Assault, as the base offense level for a civil rights violation involving conduct that satisfied the definition of aggravated assault by a preponderance of the evidence. 613 F.3d 725, 734 (7th Cir. 2010). The court in *Cozzi* explained that "the sentencing guidelines recognize that in a situation, as here, where the defendant's conduct is more reprehensible than a civil rights violation that used a minor amount of force, the defendant's sentence should be on par with other defendants in federal court who committed similar conduct…" *Id.* (internal citations omitted). The court further reasoned that even though both § 2H1.1 and § 2A2.2 could account for the defendant's underlying conduct, "the plain language of § 2H1.1 specifically directs the district court to use the guideline that produces the greatest base offense level." *See also United States v. Porter*, 928 F.3d 947, 967 (10th Cir. 2019) (holding it was error to cross-reference to § 2A2.3 because it resulted in lower base offense level than § 2H1.1); *United States v. Serrata*, 425 F.3d 886, 908 (10th Cir. 2005) (upholding cross-reference to § 2A2.2); *United States v. Broussard*, 882 F.3d 104, 111 (5th Cir. 2018) (same); *United States v. Sims*, 143 F. App'x 210, 214 (11th Cir. 2005) (upholding cross-reference to § 2K1.4).

**A. Here, a cross-reference to § 2A6.2, Stalking or Domestic Violence, is appropriate because a preponderance of the evidence establishes that the defendant violated the federal stalking offense and D.C.'s stalking offense.**

The cyber stalking guidelines, § 2A6.2, capture the actual conduct at issue here. The defendant's decade long campaign to terrorize these victims is materially different than threats cases that involve a single email to an organization, no matter how egregious it may be. The defendant's harassment, intimidation, and deliberate effort to worm his way into the

consciousness of the victims is different in kind than the one-off hateful threat to a mosque or reproductive health clinic.  The entire purpose of the guidelines is to try to capture the nature of the offense and the actual conduct at issue for sentencing purposes, as long as *Apprendi* principles are observed. *See Apprendi v. New Jersey,* 530 U.S. 466 (2000). In fact, the entire structure of the U.S.S.G. with its cross-references is a testament to that jurisprudential approach.

Here, the defendant undeniably threatened the victims through interstate commerce and communicated threats of force motivated by ethnic hatred and the victims' employment.  Those charges were well founded.  But, the actual conduct, the real impact, and the social harm - the things sought to be captured at sentencing – are appropriately encapsulated by the cyberstalking guidelines.  Application of those guidelines distinguish the defendant's conduct from the single-threats type of case.  As such, the focus of the U.S.S.G. is on "actual conduct" rather than on a litany of statutes that could have been charged. *See e.g. United States v. Blanco*, 888 F.2d 907, 910 (1st Cir. 1989) ("the Guidelines instruct [the court] to determine the applicability of various adjustments (specific offense characteristics, chapter three adjustments, certain cross references) by looking to the offender's actual conduct. Thus, if a bank robber shoots a teller, the court will increase his sentence in light of what actually occurred, whether or not the charge or the trial involved the shooting; that is because the bank robbery guideline, reflecting the types of factors that tended to make a difference to actual time served in the pre-Guideline era, contains a 'specific offense characteristic' for shooting a weapon."); see also *United States v. Drew*, 200 F.3d 871, 879 (2000) (holding that "a sentencing court may consider a defendant's conduct apart from his offense conduct without violating due process" in upholding District Court's cross reference to attempted murder guideline – based on hearsay evidence that was in the record – where the defendant had pleaded guilty to possessing a firearm in violation of 18 U.S.C.S. §

922(g)(8)). And the guidelines make clear that courts are directed to apply the greatest base level

offense of "applicable to *any* underlying offense." § 2H1.1(a)(1) (emphasis added).

In this case, facts meeting the elements of a violation of 18 U.S.C. § 2261A, the federal

interstate stalking offense, are covered by § 2A6.2, which is the underlying offense with the

greatest offense level. *See* § 2A6.2, Commentary; *see also United States v. Yilmaz*, 910 F.3d 686,

689 (2d Cir. 2018); *United States v. Cain*, No. 18-1721, 2019 WL 2723650, at *4 (1st Cir. July 1,

2019); *United States v. Seymore*, 747 F. App'x 558, 559 (9th Cir. 2018); *United States v.

Bowker*, 372 F.3d 365, 391 (6th Cir. 2004) *vacated on other grounds by United States v. Booker*,

543 U.S. 220, 249 (2005); *United States v. Reichard*, 151 F. App'x 200, 205 (3d Cir. 2005);

*United States v. Ogden*, 725 F. App'x 441, 442 (8th Cir. 2018). Section 2261A prohibits:

> whoever…with the intent to… harass, [or] intimidate, … uses… any interactive …
> electronic communication service … of interstate commerce…to engage in a course of
> conduct that … places that person in reasonable fear of the death of or serious bodily injury
> to a person…

A preponderance of the evidence establishes that the defendant, over the course of five

years, used email to engage in a course of conduct that would have placed a reasonable person in

fear of death and serious bodily injury and that he did so with the intent to harass and intimidate

the employees. The defendant stipulated at trial that he had previously threatened AAI employees

through emails and voicemails sent in 2006 that used the phrases "Death to the Arabs" and "The

only good Arab is a dead Arab." Transcript, May 6, 2019, 27:20-25; 33:1-8. He stipulated that he

intended to "scare" the employees "so they could be concerned that he might do something to harm

them." *Id.* at 33:17-22. He also stipulated that "the repetition of the word death in the messages

would have had an effect on the employees to the point that they would be scared," and that "people

who receive the messages could consider the statements that he made as a serious expression of

an intent to inflict physical injury." *Id.* at 33:23-25; 34:1-5. He stipulated that he "used this

language so that the AAI employees would be concerned that he was capable of harming them and that he would actually carry out the threats." *Id*. at 34:6-9. Finally, the defendant stipulated that "he intended the 2006 emails and voicemails as a serious expression of an intent to inflict physical harm on the AAI employees who received them," and "he knew that his words would be construed by others as a threat of force." *Id*. at 36:1-7. Additionally, the former FBI agent who interviewed the defendant about his 2006 threats testified at trial that the defendant admitted to him that he had sent the threats in an effort to "intimidate" the AAI employees. Greg Bristol testimony, May 6, 2019, 70:6-21; see also Gov. Exhibit 8 (whereby the defendant admitted that his 2006 threats were sent "with the intent to either intimidate or interfere with" the AAI employees).

Following these initial threats in 2006, the defendant sent AAI employees 735 emails from 2012 to 2017, culminating in the five charged emails the defendant sent in the summer of 2017 that used the phrases "Death to all Arab Americans," "Death to the homophobic Arab American Institute and to James Zogby," "The only good Arab American is a dead Arab American," and "LGBT Americans will never be safe until we cleanse America of Zogby and his … Arab American monsters." *See* Gov. Exhibit 1 and 3. Many of the 735 emails contained in Government Exhibit 3 employed similar phrases to the five charged emails, including "Death to Arabs" (email dated August 8, 2014), "Death to the Arab American Institute" (email dated November 16, 2014), "#DeathtoPalestinians" (email dated July 20, 2014), "#DeathToArabs" (email dated September 23, 2014), "ethnic cleansing is good" (email dated October 10, 2016), "It's time for ethnic cleansing of Arabs in America" (email dated January 27, 2017), as well as an article with the title, "The only good Arab is a dead Arab" (email dated March 8, 2014). Several AAI employees testified at trial that the hundreds of emails leading up to the charged threats similarly made them fear the defendant was going to harm them. Maya Berry testimony, May 3, 2019, 111:2-5; 120:14-

17; James Zogby testimony. May 6, 2019, 120:6-14; 122:2-20; 124:25 – 125:1-5; 125:8-10.

The jury was presented with evidence that the defendant then continued his course of conduct by sending five emails containing a true threat in the summer of 2017. Four of the recipients of these emails testified at trial to the fact that they perceived these messages as threats to their lives, that the messages made them fear the defendant would come to their offices to kill them, and that as a result they took concrete steps to protect themselves. Maya Berry testimony, May 3, 2019, 38:7; 43:10-15; 52:13-20; 96:11-25; 97:1-10; Margaret Lowry testimony, May 3, 2019, 150:25-151:14; 156:7-14; 157:20-23; James Zogby testimony, May 6, 2019, 122:2-20; 152:1-21; Jennifer Salan testimony, May 7, 2019, 84:4-9; 95:1-2; 98:10-24. Additionally, a recipient of one of the threats who worked at another non-profit, the American-Arab Anti-Discrimination Committee, testified that he also considered the message a threat to kill him and his colleagues, and took concrete actions to protect his organization. Abed Ayoub testimony, May 7, 2019, 62:19-25; 63:1-20; 70:8-13; 72:17-24. The jury ultimately concluded that these emails amounted to true threats.

Such evidence establishes by a preponderance of the evidence that the defendant's pattern of conduct consisting of sending AAI employees 735 emails over the course of five years (after having been convicted of threatening AAI employees in 2006), and then sending employees the five charged threats in the summer of 2017 constituted a violation of 18 U.S.C. § 2261A by a preponderance of the evidence. Previous courts have upheld convictions under § 2261A involving analogous facts. *See e.g. United States v. Sulik*, No. 18-5978, 2019 WL 2864352, at *1 (6th Cir. July 3, 2019) (upholding stalking conviction for defendant who sent emails threatening a government official with no overt act by the defendant); *Yilmaz*, 910 F.3d at 689 (upholding stalking conviction for defendant who sent over 10,500 emails to the victim, her friends, and

family); *United States v. Osinger*, 753 F.3d 939, 941 (9th Cir. 2014) (upholding stalking conviction for defendant who sent "several threatening and sexually explicit text messages, emails, and photographs" of the victim to the victim, as well as her co-workers and friends). This case law makes clear that even just the five threatening emails identified in the Indictment would suffice to establish a stalking violation.

Section 2A6.2 should be cross-referenced pursuant to § 2H1.1(a), regardless of whether the government could have charged the defendant with violating 18 U.S.C. § 2261A. *See e.g. Cozzi*, 613 F.3d at 734 (noting that the defendant "could only violate [the victim's] civil rights by *doing* something. It is that something that constitutes the underlying offense for purposes of § 2H1.1, regardless of how many substantive counts [are] charged"). The guidelines allow for cross-references to offenses that were only state violations, offenses upon which there was an acquittal, and offenses where the nature of the guideline varies greatly depending on the specific offense characteristic. See e.g. *United States v. Gatling*, 639 F. Supp. 2d 4, 7 (D.D.C. 2009) (upheld sentence where trial court cross referenced Guidelines for attempted murder when defendant was aquitted on attempted murder charge, but convicted of firearms possession). Once the underlying guidelines associated with the offense of conviction is properly applied, the U.S.S.G. structure operates through cross-references to distinguish one defendant's conduct from another to individualize the sentence and capture the actual harm as closely as possible. The D.C. Circuit, for example, has upheld the District Court's cross-referencing of guidelines applying to underlying offenses in cases where the government could have theoretically charged the underlying offense. See e.g. *United States v. Zagorski*, 807 F.3d 291, 292 (D.C. Cir. 2015) (upheld trial court's cross-reference to the guideline provision covering production of child pornography where defendant pleaded guilty to distribution of pornography covered by a separate guideline provision); *United*

*States v. Hawkins,* 185 F. Supp. 3d 114, 127 (D.D.C. 2016) (court cross-referenced to obstruction of justice guideline, U.S.S.G. § 2J1.2, where the defendant had pleaded guilty to making a false statement in violation of 18 U.S.C. § 1001 covered by U.S.S.G. § 2B1.1); *United States v. Long*, 185 F. Supp. 2d 30, 35 (D.D.C. 2001) (court cross referenced guidelines provision for interstate transportation of minor to produce a visual depiction of such conduct, where defendant pleaded guilty to interstate transportation of minor to engage in sexual activity covered by a different guideline provision.).

The plain language of § 2H1.1 makes this clear, as it directs courts to apply the offense guideline applicable to "any" underlying offense. It does not make an exception for instances in which federal charges could have been brought for the underlying offense, but for whatever reason were not. Likewise, U.S.S.G. § 1B1.3(a)(1)(A) directs courts to consider "all acts and omissions committed . . . by the defendant" in determining the appropriate guidelines, without distinguishing between what the government could or could not have charged.

Even if the defendant's conduct did not fall under any underlying federal offense, the court must then consider any state or local offense analogous to the defendant's conduct. *United States v. Epley*, 52 F.3d 571, 582 (6th Cir. 1995). Here, the defendant's underlying conduct clearly constitutes a violation of Code of the District of Columbia § 22-3133, Stalking. Similar to the federal statute, § 22-3133 makes it unlawful for a person to purposefully engage in a course of conduct directed at a specific individual:

> (1) With the intent to cause that individual to: (A) Fear for his or her safety or the safety of another person; (B) Feel seriously alarmed, disturbed, or frightened; or (C) Suffer emotional distress;
>
> (2) That the person knows would cause that individual reasonably to: (A) Fear for his or her safety or the safety of another person; (B) Feel seriously alarmed, disturbed, or frightened; or (C) Suffer emotional distress; or

(3) That the person should have known would cause a reasonable person in the individual's circumstances to: (A) Fear for his or her safety or the safety of another person; (B) Feel seriously alarmed, disturbed, or frightened; or (C) Suffer emotional distress.

A preponderance of the evidence clearly establishes that the defendant directed a course of conduct, namely the five charged threats and 735 previous emails, with the intent to cause the AAI employees fear for their safety or with the knowledge that the employees would fear for their safety. He essentially admitted as such when he pleaded guilty in 2008 to threatening AAI employees with nearly the same threats as he sent in 2017.

### B.  As a result, pursuant to § 2H1.1(a), § 2A6.2 should apply as the base level offense because it is higher than 10.

Section 2A6.2(a) states that the base offense level for stalking violations is 18. Further, under § 2A6.2(b)(1)(E), the offense level should be increased by 2 levels for a "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim." A "pattern" of activity may involve different methods of stalking. *See Cain*, No. 18-1721, 2019 WL 2723650, at *2 (applying (b)(1)(E) for threatening the same victim over emails and tracking her movements via a cellphone application). However, it also may apply to just one method of stalking. *See Yilmaz*, 910 F.3d at 689 (applying (b)(1)(E) for over 10,000 emailed threats). Indeed, the First Circuit has held that a "series of emails" alone constitutes a pattern of activity for purposes of (b)(1)(E). *United States v. Lee*, 790 F.3d 12, 19 (1st Cir. 2015); *see also United States v. Robinson*, 433 F.3d 31, 37 (1st Cir. 2005) (applying (b)(1)(E) for three specific instances of assault or threats to the same victim).

For purposes of Counts One through Seven, cross-referencing § 2A6.2 would result in a base offense level of 20. Here, the defendant sent five emails that were found by the jury to constitute a true threat. Additionally, as discussed previously, the defendant sent the AAI employees over 700 emails in the five years leading up to the charged threats, many of which were

harassing and intimidating.[1] Such conduct constitutes a pattern of threatening, harassing, and assaulting each of the seven victims named in Counts One through Seven.

## II.     A guidelines sentence is appropriate in this case.

The pertinent sentencing factors provided in 18 U.S.C. § 3553 make clear that a guidelines sentence is warranted in this case.[2]

### A.  The threats themselves were egregious

The defendant not only threatened his victims with death, but made clear to his victims that his true aim was a wholesale cleansing of all Arab Americans. These threats made the Arab American Institute (AAI) employees fear that at any moment he would walk through their office doors with a gun and start shooting. Maya Berry testimony, May 3, 2019, 52:13-20; Margaret Lowry testimony, May 3, 2019, 150:12-16, 151:4-14; James Zogby testimony, May 6, 2019, 99:12-16, 125:23-24; Jennifer Salan testimony, May 7, 2019, 63:6-11, 96:4-5. This fear left employees like Maya Berry terrified each time she heard the ding of the office elevator. Maya Berry Testimony, May 3, 2019, 100:20-101:3. It left Jennifer Salan arguing with her husband about whether he should carry a gun to protect them in public. Jennifer Salan Testimony, May 7, 2019,

---

[1] By the government's count, the defendant sent James Zogby approximately 617 emails from 2012 to 2017, Maya Berry approximately 240 emails from 2012 to 2017, Heba Mohammad approximately 23 emails starting in 2017, Jennifer Salan approximately 32 emails from 2016-2017, Margaret Lowry approximately 32 emails from 2014-2017, Meredith Pahowka approximately 148 emails (includes emails sent to generic addresses she monitored) from 2014 to 2017, and Omar Baddar approximately 23 emails from 2012 to 2017 (he left AAI for several years during that period).

[2] Application Note 5 of U.S.S.G. § 2A6.2 states that if the enhancement under (b)(1) "does not adequately reflect the extent or seriousness of the conduct involved, an upward departure may be warranted." This note then describes a typical example, such as when "the defendant stalked the victim on many occasions over a prolonged period of time." Though the Government does not request an upward departure from the Guidelines in this case, appeals courts have repeatedly upheld above-Guidelines sentences when district courts find the facts of the case to be particularly egregious. *See Cain*, No. 18-1721, 2019 WL 2723650, at *3 (upholding statutory maximum 60-month sentence for 13 month-long barrage of "emails, texts, and calls"); *United States v. Bowker*, 372 F.3d 365, 391 (6th Cir. 2004) (upholding upward departure because "the harassment occurred over a period of years and in two different states; involved numerous, multi-media contacts in the form of letters, telephone calls, email and interstate travel; and involved contacts with Knight's friends and family members.").

98:19-24. It left Margaret Lowry sitting in her law school lecture hall 150 miles from D.C. worried that the defendant would burst through the doors to make good on his threats. Margaret Lowry Testimony, May 3, 2019, 159:15-19. Fear that left Dr. Jim Zogby crying in front of his daughter overwhelmed by the harm the defendant was causing his colleagues, his family, and himself. Sarah Zogby Testimony, May 3, 2019, 181:5-22.

The defendant used this fear as a weapon to attempt to force his victims into stopping their work on behalf of Arab Americans. Government Stipulation Number One, May 6, 2019, 33:17-22. The impact was real. Some scaled back their advocacy so as to avoid the defendant's ire. Maya Berry testimony, May 3, 2019, 93:15-95:7. College interns were restricted from working on certain projects to protect them from the defendant. *Id*. at 104:5-8. The small non-profit was forced to enact security measures to protect them from the defendant: key fobs were required to access their floor; a photo of the defendant was provided to the security guard and made available for all employees; and police presence was requested for public events. *Id*. at 95:11-96:5, 96:14-97:10, 99:2-21, 100:13-23.

The defendant's threats had an impact beyond even the seven victims named in the charges. They left a daughter pleading for her parents to install an alarm system, terrified that the defendant would find out where they lived. Sarah Zogby testimony, May 3, 2019, 185:14-186:2. They left a wife staring at a picture of the defendant, hiding out in her home when she noticed a strange car parked out front. Eileen Zogby Testimony, May 7, 2019, 110:21-111:8. The threats left a security guard playing through violent scenarios in her head, worrying about coming home to her kids at the end of the day. Melody Rogers testimony, May 3, 2019, 169:14-171:4. They left another local advocacy group enacting security measures out of fear that the defendant would come to their offices to commit violence. Abed Ayoub testimony, May 7, 2019, 72:17-24.

**B.  The defendant's threats were a culmination of 5 years of harassing, threatening, and intimidating communications.**

Through over 735 emails sent from 2012 to 2017, the defendant waged a five year campaign of threats, harassment, bigotry, hate, and intimidation against the AAI employees because of his extreme hate for all Arab Americans and those who advocate on their behalf. *See* Gov. Trial Exhibit 3. These emails, sent nearly every week of every year for five years, were often filled with violent, hateful, and racist language directed towards those of Arab descent. They appeared to the recipients to be clear attempts to dehumanize and debase them, so as to justify killing them. Maya Berry Testimony, May 3, 2019, 111:2-8; James Zogby Testimony, May 6, 2019, 121:14-25; Jennifer Salan Testimony, May 7, 2019, 88:22-89:1. Many contained similar language as his 2017 threats. See e.g. Id., Email dated August 8, 2014 ("Death to Arabs"); Email dated November 16, 2014 ("Death to the Arab American Institute"); Email dated July 20, 2014 ("#DeathToArabs"); Email dated October 10, 2016 ("ethnic cleansing is good"); Email dated January 27, 2017  ("It's time for ethnic cleansing of Arabs in America"); Email dated March 8, 2014 (Article entitled, "The only good Arab is a dead Arab").

The defendant's barrage of emails over the five years created a constant sense of anxiety and dread in many of the AAI employees. Dr. Zogby testified that these emails made him fear that the defendant was laying the groundwork to commit an act of extreme violence, emails that left Dr. Zogby with a repeating visceral image of the defendant at their offices holding a gun. James Zogby Testimony, May 6, 2019, 122:17-123:2; 99:12-24. Maya Berry described feeling a wave of anxiety each time a new email arrived in her inbox, worried that the defendant would have finally snapped; an anxiety that persisted for five years leading up to the charged threats in 2017. Maya Berry testimony, May 3, 2019, 119:3-17.

**C. The defendant sent the threats despite being told on numerous occasions that his conduct was unlawful and that it caused his victims real harm.**

The defendant, through his actions, has shown a complete disregard for the law. A guidelines sentence is appropriate, in part, to "promote respect for the law," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." The defendant was convicted of threatening AAI employees in 2017 despite having been previously convicted of threatening AAI employees in 2006, having served a year in federal prison, having heard previous testimony from his earlier victims regarding the harm his threats caused, and having been told over and over again in plea, sentencing, revocation, and status hearings that sending these threats was unlawful. *See* 18 U.S.C. § 3553(a)(2)(A).

The defendant has shown that he will not be deterred from threatening and intimidating the AAI employees and that the only way to ensure he will not continue to threaten his victims is through incarceration. Within just two months of the termination of supervised release for his previous threats, the defendant resumed sending AAI employees emails containing hateful, intimidating, and violent language. Even while on supervised release, the defendant on numerous occasions contacted third parties to disparage and harass Dr. Zogby and his staff. *See e.g.* Case 1:07-cr-00204, Hearings on Violations of Supervised Release, Dkt. at 96, 97, 107, 109, and 113. As this Honorable Court determined in February 2019, even after being charged with 14 counts of threatening AAI employees, the defendant violated his conditions of release by sending a communication to Arlington County Board members that used similar language as the threats he has been convicted of sending to AAI. *See* Dkt. at 63. The defendant has shown that he will not be deterred by the law, by the threat of further incarceration, or by pleas from his victims to stop.

**D. The criminal history points under the guidelines do not account for the egregiousness of targeting the same victims as prior criminal misconduct.**

There is something particularly egregious about targeting the same people again. Under the federal sentencing guidelines, the defendant's criminal history is taken into account in calculating the recommended range of incarceration. Pursuant to U.S.S.G. §4A1.1, the defendant would receive two criminal history points for his 2008 "prior sentence of imprisonment of at least sixty days" and one additional point for a prior DUI conviction. §4A1.1(b) and (c). Three points results in a criminal history category of II. §5A, Sentencing Table.[3]

However, criminal history points don't adequately capture the cruelty of targeting the same people who were previously victimized and had hoped that the defendant's prior incarceration would act as future deterrent. His conduct amounted to a different level of victimization; it amounted to cruelty and it played on his prior criminal conduct for which he was incarcerated. . A guidelines sentence, in accordance with Probation's calculations, is the only way to assure the victims and the Arab American community at large that the defendant will not resume his threats any time soon.

**III.   During his period of supervised release, the defendant should be prohibited from using the internet without prior approval from the Probation Office.**

In addition, once released from incarceration, the government requests that this Court prohibit the defendant from accessing the internet for any reason without prior written approval from the Probation Office for the duration of his period of supervised release. The defendant's

---

[3] The guidelines reason that, "a defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation. U.S.S.G. §4A, Introductory Commentary.

long history of fixation on his victims requires this condition to vindicate their legitimate interests in reducing the likelihood of future victimization. Under 18 U.S.C. § 3583(d)(1), sentencing courts "are broadly authorized to impose conditions of supervised release that are reasonably related to the nature and circumstances of the offense, the history and characteristics of the defendant, deterrence of criminal conduct, protection of the public, and treatment of the defendant's correctional needs." *United States v. Legg* 713 F.3d 1129, 1131-32 (D.C. Cir. 2013) (quoting *United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012)). In addition, conditions of supervised release must "involve[] no greater deprivation of liberty than is reasonably necessary" for the purposes of deterrence, protection of the public from further crimes of the defendant, and effective correctional treatment. *Id.* (quoting 18 U.S.C. § 3583(d)(2)). Within these constraints, sentencing judges are afforded wide discretion in imposing terms and conditions of supervised release. *Id.*

A prohibition on unapproved internet use complies with the requirements of 18 U.S.C. § 3583(d), in that it is reasonably related to the sentencing factors set forth in 18 U.S.C. § 3553(a) and involves no greater deprivation of liberty than is necessary for the purposes therein. The nature and circumstances of the defendant's offense and his history and characteristics both strongly suggest that restrictions on and close supervision of his use of the internet are necessary to protect the public and prevent him from committing further offenses. Nor is such a condition more restrictive than reasonably necessary. Indeed, a prohibition on unapproved internet usage would be substantially less restrictive than the condition approved by the D.C. Circuit in *United States v. Love*, 593 F.3d 1, 11 (D.C. Cir. 2010), which required the defendant to seek probation office approval prior to possessing or using any computer equipment capable of accessing the internet. In *Love* and its progeny, the D.C. Circuit has made clear that restricting an offender to only pre-approved internet usage is an appropriate condition of supervised release for offenders who have

used the internet to commit their crimes. *See id.* at 12; *See also United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017); *Legg*, 713 F.3d at 1131-32; *United States v. Laureys*, 653 F.3d 27, 35 (D.C. Cir. 2011); *Accardi*, 669 F.3d at 347-48. This condition also accords with language commonly used by the Probation Office in cases involving online offenses.

## IV.    Conclusion

For the reasons stated, the United States recommends that this Court impose a sentence within the guidelines range of 87 to 108 months. Such a sentence will capture the harm to the victims perpetrated by the defendant, prevent future harm from being committed, account for other relevant § 3553 factors, and consider the defendant's situation.

Respectfully submitted this 7th day of August, 2019.

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

  */s/* Mark Blumberg
MARK BLUMBERG
Senior Legal Counsel
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 305-2798
Mark.Blumberg@usdoj.gov
DC Bar No. 448399


  */s/* Nicholas Reddick
NICHOLAS REDDICK
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-3120

Nicholas.Reddick@usdoj.gov
CA Bar No. 288779

## <u>CERTIFICATE OF SERVICE</u>

I **HEREBY CERTIFY** that a copy of the foregoing pleading was served via the Electronic Case Filing system upon the defendant's counsel, Stuart Sears, Esq., this 7th day of August, 2019.

_/s/_ Nicholas Reddick
NICHOLAS REDDICK