UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) Case No. 1:18-CR-00036 (RDM) |
| WILLIAM PATRICK SYRING, | ) |
| Defendant. | ) |

## DEFENDANT WILLIAM PATRICK SYRING'S
## MEMORANDUM IN AID OF SENTENCING

William Patrick Syring stands before the Court for sentencing following his conviction by jury on 14 counts for sending threatening emails to seven employees of the Arab American Institute ("AAI") over two months in the summer of 2017. As the Court is aware, this is not the first time Mr. Syring will be sentenced for sending threatening emails to AAI employees. Indeed, just over 10 years ago, Mr. Syring pleaded guilty to sending similar communications to employees of the same organization. For that, Mr. Syring must be incarcerated for a longer period than the 12 months and 1-day sentence that was imposed in 2008.

For the reasons that follow, however, we submit that the Court should also consider the reality that Mr. Syring has never said that he would harm anyone, has never wavered from his insistence that he would never harm anyone, and has never posed an actual threat to anyone, including the recipients of his emails. He has been evaluated multiple times by different forensic psychologists, all of whom have determined that he is not a risk of harm to himself or others. Rather, the evidence establishes that he is a non-violent individual who uses the same harsh language whether he is opposing the views of an Arab-American, a pro-choice journalist, or a local county board official.

1

The Court should also consider that, until his May 2019 trial, Mr. Syring had never meaningfully tested the government's theory that his words, none of which expressed an explicit intent to harm anyone, violated the First Amendment. While that is unlikely to earn him any sympathy from the Court, the government or the victims, it does suggest that Mr. Syring will accept now what he was unable or unwilling to accept before – that the type of language he used in this case and in other circumstances violates the law and must stop. For the reasons set forth below, and in light of all of the factors the Court must consider in imposing a punishment that is sufficient but not greater than necessary to achieve the purposes of federal sentencing, Mr. Syring asks the Court to impose a sentence of 3 years of incarceration followed by 3 years of supervised release on Counts 8 through 14, and a sentence of 5 years of probation on Counts 1 through 7.

## I.     THE BASELINE ADVISORY SENTENCING GUIDELINES RANGE

The statutory maximum punishment for Mr. Syring's offenses on Counts 1 through 7 (Class A misdemeanors) is imprisonment for up to one year, five years' probation, one year of supervised release, and a maximum fine of $100,000. *See* Presentence Investigation Report ("PSR") ¶¶ 131-2, 139-40, 149-50, 155-56. The statutory maximum punishment for Syring's offenses on Counts 8 through 14 (Class D felonies) is imprisonment for up to five years, one to five years of probation, no more than three years of supervised release, and a maximum fine of $250,000. *See id*. ¶¶ 133, 140, 150, 156. The United States Probation Office has determined that, under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Mr. Syring has a total Total Offense Level 28 and a Criminal History Category of II, which together result in an advisory Sentencing Guidelines range of 87-108 months of incarceration.

The PSR's calculations include the application of a disputed cross-reference under U.S.S.G. §2H1.1 to the Guidelines section applicable to "Stalking and Domestic Violence"

(§2A6.2), for the seven misdemeanor violations of 18 U.S.C. § 245(b). For the reasons described below,[1] Mr. Syring disagrees with the PSR's cross-reference to the stalking guideline and instead recommends that the Court calculate the 18 U.S.C. § 245(b) convictions (Counts 1 through 7) under §2H1.1(a)(3). If the Court were to follow Mr. Syring's recommendation, his Total Offense Level would decrease from 28 to 22, bringing the advisory sentencing range down from 87-108 months to 46-57 months.[2]

The §2H1.1(a)(1) cross-reference is inappropriate in Mr. Syring's case. First, §2H1.1(a)(1), which calls for the application of the offense level from the offense guideline applicable to any underlying offense, is not designed or intended to reach the same type of conduct/offense behavior that is already captured by §2H1.1(a)(1) as the basis of the 18 U.S.C. § 245 violation, which in this case was the threatening communications contained in Counts 8 through 14 and that are correctly grouped with Counts 1 through 7. The First Circuit endorsed such an interpretation when it reasoned that:

---

[1] Mr. Syring also raised a second objection to the PSR based on his belief that his conduct did not meet the elements of the federal stalking statute, regardless of whether the cross-reference applied. While that argument is mentioned in the PSR he expands here briefly to argue that application of the cross-reference is inappropriate because the only communications sent by Mr. Syring that would justify a criminal prosecution, let alone conviction, are those that conveyed threats of force or violence. That is because Mr. Syring's comments to public figures and members of a public organization are clearly protected by the First Amendment and the mere fact that he repeated those statements 700+ times over 7 years cannot elevate them to a crime. The communications were all made to the recipients' work email and/or the AAI website and the *vast majority* of them consisted only of forwarded articles with minimal, if any, comment. Imposing a higher Guidelines range for conduct not proven beyond a reasonable doubt and not prosecuted by the government despite its apparent ability to do so, raises serious constitutional concerns regarding Mr. Syring's First Amendment rights as well as a criminal defendant's right to a trial, due process, double jeopardy and fundamental fairness.

[2] *See* Final PSR at 32 (indicating that if the Court agrees with Mr. Syring's Guidelines argument, "the computation provided by defense counsel is accurate…[and] the defendant's advisory guideline range would be 46 months to 57 months."

3

> The logic of the [cross-reference] provision can be inferred from civil rights violations involving underlying offenses *such as sexual assault and murder, which the 'cross-referencing' provision ensures carry far higher base offense levels than civil rights violations involving only minor force or the threat thereof*. The Sentencing Commission intended that crimes like the defendant's be punished at least as severely as if they had occurred under federal jurisdiction but not during a civil rights violation. Courts of appeals have applied §2H1.1(a)(1) accordingly. *See, e.g., United States v. Allen,* 341 F.3d 870, 894–95 (9th Cir.2003) (approving cross reference to aggravated assault for base offense level); *United States v. Webb,* 252 F.3d 1006, 1010 n. 6 (8th Cir.2001) (concluding that it would be an error of law to fail to apply higher base level of cross-referenced offense); *United States v. Velazquez,* 246 F.3d 204, 209 (2d Cir.2001) (discussing cross-referencing to homicide offenses in civil rights sentencing of prison guard who killed inmate).

*United States v. Byrne*, 435 F.3d 16, 27–28 (1st Cir. 2006) (emphasis added) (internal footnotes and page citations omitted).

Second, the logic in *Byrnes* makes perfect sense because threats cases alone under § 245(b) do not allow for an increase in the statutory maximum punishment of one year. Rather, the statutory maximum can only be increased upon a finding, *by a jury*, of bodily harm, death, or the threatened use of a dangerous weapon. *See* 18 U.S.C. § 242 ("and if bodily injury results…shall be…imprisoned *not more than ten years*")' 18 U.S.C. § 245(c) ("and if bodily injury results…or if such acts include the use, attempted use, or threatened use of dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned *not more than ten years*…and if death results…imprisoned for *any term of years or for life*….") (emphasis added). Therefore, in order for the same Guideline section applicable to a civil rights misdemeanor offense to have any relevance in a civil rights case involving actual physical harm or the threatened use of a dangerous weapon, and a maximum punishment of up to life, it naturally should cross-reference to the underlying aggravated offense that triggered the statutory maximum increase in the first place. That is what the *Byrnes* Court recognized when it held that the "'cross-referencing' provision

4

ensures [ ] far higher base offense levels than civil rights violations involving only minor force or the threats thereof." *Byrne,* 435 F.3d at 27–28; *see also See United States v. Cozzi*, 613 F.3d 725, 734 (7th Cir. 2010) ("There are myriad ways to violate someone's civil rights, so as a matter of policy and economy it makes sense to have a single, flexible cross-reference in the civil rights guideline, rather than include a reference to the civil rights guideline in every conceivable section covering conduct that might also violate a victim's civil rights."). It makes no sense, and would serve no purpose, to intend the cross-reference to apply to potential offenses that would increase the Guidelines range to 87 months for an offense that, due to its nature, only carries a one-year statutory maximum.

Nevertheless, the government's sentencing memorandum devotes pages to the concept that cross-references can be appropriate and Mr. Syring does not disagree. Nor does he disagree that the government could have charged him with harassment had it so desired, although, as the Court may recall, the government so adamantly believed it *could not charge* Mr. Syring with cyber-stalking or harassment that it actually objected during counsel's closing argument and asked the Court to limit the defense's argument. Rather, Mr. Syring's argument is simply that the cross-reference is only intended to ensure that higher base offense levels are applicable when the offense conduct involves more than "only minor force or the threats thereof." And for all the cases cited in the government's memorandum, *not one* involved a cross-reference to an underlying offense that only involved threats or harassment, or where the maximum statutory sentence was one year. Instead, each of the cases involved situations where an increased statutory maximum resulted from more serious underlying offense conduct, thus warranting the use of the cross-reference, which is consistent with the logic of *Byrne* and *Cozzi*. *See Cozzi*, 613 F.3d at 727 (7th Cir. 2010) (imposing a 40-month sentence and cross-referencing to *aggravated assault*); *United States v. Serrata*, 425

5

F.3d 8866 (10th Cir. 2005) (imposing a 51-month sentence and cross-referencing to *aggravated assault*); *United States v. Broussard*, 882 F.3d 104 (5th Cir. 2018) (imposing multiple sentences ranging from 40 to 54 months and cross-referencing to *aggravated assault*); *United States v. Sims*, 143 F. App'x 210 (11th Cir. 2005) (imposing a 46-month sentence and cross-referencing to *arson/property damage by use of explosives*).

For the foregoing reasons, Mr. Syring submits that Counts 1 through 7 should be calculated under § 2H1.1(a)(3), which would result in a total base offense level of 10 on each of the 7 counts. Because the first seven counts group with counts 8 through 14, by victim, Mr. Syring proposes the following Guidelines calculations:

Counts 1 and 8 (JZ)

| | | |
|---|---|---|
| Base offense level: | 12 | (§2A6.1(a)(1)) |
| Specific offense characteristic: | 2 | (§2A6.1(b)(2)) |
| Victim related adjustment: | 3 | (§3A1.1(a)) |
| **Adjusted offense level:** | **17** | |

Counts 2 and 9 (OB)

| | | |
|---|---|---|
| Base offense level: | 12 | (§2A6.1(a)(1)) |
| Specific offense characteristic: | 2 | (§2A6.1(b)(2)) |
| Victim related adjustment: | 3 | (§3A1.1(a)) |
| **Adjusted offense level:** | **17** | |

Counts 3 and 10 (MB)

| | | |
|---|---|---|
| Base offense level: | 12 | (§2A6.1(a)(1)) |
| Specific offense characteristic: | 2 | (§2A6.1(b)(2)) |
| Victim related adjustment: | 3 | (§3A1.1(a)) |
| **Adjusted offense level:** | **17** | |

Counts 4 and 11 (HM)

| | | |
|---|---|---|
| Base offense level: | 12 | (§2A6.1(a)(1)) |
| Specific offense characteristic: | 0 | (§2A6.1(b)(2))[3] |
| Victim related adjustment: | 3 | (§3A1.1(a)) |
| **Adjusted offense level:** | **15** | |

Counts 5 and 12 (MP)

| | | |
|---|---|---|
| Base offense level: | 12 | (§2A6.1(a)(1)) |
| Specific offense characteristic: | 0 | (§2A6.1(b)(2))[4] |
| Victim related adjustment: | 3 | (§3A1.1(a)) |
| **Adjusted offense level:** | **15** | |

---

[3] We submit that the two-level increase for *more than two threats* should not apply to this victim as she only received two of the charged e-mail communications.  Due to the grouping rules, removal of these two points will not impact the final Guidelines range.

[4] We submit that the two-level increase for *more than two threats* should not apply to this victim as she only received one of the charged e-mail communications.

Counts 6 and 13 (JS)

| | | |
|---|---|---|
| Base offense level: | 12 | (§2A6.1(a)(1)) |
| Specific offense characteristic: | 0 | (§2A6.1(b)(2))[5] |
| Victim related adjustment: | 3 | (§3A1.1(a)) |
| **Adjusted offense level:** | **15** | |

Counts 7 and 14 (ML)

| | | |
|---|---|---|
| Base offense level: | 12 | (§2A6.1(a)(1)) |
| Specific offense characteristic: | 0 | (§2A6.1(b)(2))[6] |
| Victim related adjustment: | 3 | (§3A1.1(a)) |
| **Adjusted offense level:** | **15** | |

Pursuant to the Grouping rules, as referenced in the PSR (¶¶ 80-83), 5 levels should be added to the greater of the adjusted offense levels as calculated above. Adding the 5 levels to the highest adjusted offense level of 17 results in a total offense level of 22. Combined with a Criminal History II, an offense level of 22 provides for an **advisory sentencing range of 46-57 months**.

Regardless of how this Court resolves the disputed Guidelines, calculating the baseline advisory Guidelines range is merely the first step in the federal sentencing process. *See Gall v. United States*, 552 U.S. 38 (2007). After calculating the baseline Guidelines range, the court must determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range. *Id*. Once the final advisory Guidelines range is determined, the Court then must consider

---

[5] We submit that the two-level increase for *more than two threats* should not apply to this victim as she only received two of the charged e-mail communications.

[6] We submit that the two-level increase for *more than two threats* should not apply to this victim as she only received two of the charged e-mail communications.

the factors set forth in 18 U.S.C. § 3553(a) and decide whether a variance from the Guidelines is warranted based on the circumstances and features of the case and the defendant before it. *Id*. Under the circumstances set forth herein, we respectfully submit that consideration of the Guidelines and the § 3553(a) factors warrant a sentence of three years' incarceration followed by a term of supervision.

## II.     THE 18 U.S.C. § 3553(a) FACTORS

In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute. Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant;  (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7).

Under § 3553, the advisory Guideline range receives no presumption of reasonableness, nor does any presumption of unreasonableness attach to a sentence that varies from the Guideline range. *See Gall*, 522 U.S. at 50; *see also id*. at 52 ("It has been uniform and constant in the federal

9

judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)). In the instant case, we submit that a custodial sentence of three years is appropriate after consideration of all of the § 3553(a) sentencing factors.

### a. The Nature and Circumstances of the Offense

The nature and circumstances of Mr. Syring's offense is recounted in great detail in the PSR's offense conduct section. *See* PSR at 5-10. Put simply, Mr. Syring has been emailing AAI employees, primarily J.Z., since approximately 2012.[7] Of the 700+ emails he sent between 2012 and 2018, the phrases charged in the instant case: "the only good Arab (American) is a dead Arab (American);" "Death to Arabs (JZ, AAI, etc.);" and "(ethnic) cleansing," only appear 11, 27 and 43 times respectively.[8] Thus, the vast majority of the emails Mr. Syring sent to AAI employees did not contain threats and were, therefore, protected by the First Amendment. Nevertheless, Mr. Syring was on notice, as a result of the 2008 prosecution and plea, that at a minimum, a district judge had determined that the repetition of the phrases he used in 2006, violated the law. For that reason, the nature and circumstances of his offense admittedly support a sentence of incarceration.

---

[7] Mr. Syring also sent a handful of communications to AAI and J.Z. in 2006, which formed the basis of his 2008 conviction. He resumed emailing AAI following the termination of his period of supervised release in 2012.

[8] This figure was calculated by searching the terms "death to," "only good," and "cleanse" on Govt. Exhibits 1A-E and 3. For that reason, and because some articles and forwarded messages contained similar expressions, it is likely that these numbers slightly inflate the number of actual threatening communications.

### b. The History and Characteristics of the Defendant

Mr. Syring's history and characteristics are difficult to reconcile with his inflammatory political rhetoric. As the Court is aware, Mr. Syring served his country's interests overseas as a Foreign Service Officer with the U.S. Department of State. He served on difficult tours in sometimes tumultuous regions and prior to the September 11, 2011 terrorist attacks, appears to have performed his job without incident. As a gay man that came of age in the 70s and 80s, he learned early on that his professional life depended on keeping to himself. He therefore devoted his free time to reading, learning languages, and traveling—pursuits that he believed would make him a better foreign service officer. He was not the type of man that would engage in the type of behavior for which he has been convicted.

The 9/11 attacks, however, changed Mr. Syring just as much, perhaps, as they changed his country. He was serving in Germany at the time and one of his responsibilities was to approve visa applications for travel to the U.S. Following the attacks, he meticulously reviewed every visa he had ever approved in order to ensure that he had not issued one to any of the 9/11 hijackers who had traveled to the U.S. from Germany. Thereafter, he began to routinely deny visas to individuals who had been born in countries he believed supported terrorism, such as Saudi Arabia, Lebanon, and others. When several of his denials arrived to the applicants with the word terrorist written on the envelope or application, he was admonished by State Department officials. Mr. Syring also began a letter-writing campaign to banks that did business with countries he believed supported terrorist acts against the United States. This too brought Mr. Syring to the attention of State Department officials and ultimately resulted in his transfer out of Germany back to the U.S.

Mr. Syring's anti-terrorism mission continued in the form of emails, letters and internet postings where he made clear his disdain for those who either supported or refused to condemn

terrorism. It is clear from his writings and history that Mr. Syring is passionate about his country's and Israel's right to defend themselves from terrorism and those who he believes sympathize with anti-American or anti-Israel causes. Of course, there is nothing wrong or illegal about his opinions and goals but as the jury verdict has now confirmed, he has crossed the line in how he delivers his message. At age 61, with significant health issues, this case is likely Mr. Syring's last chance to conform his message to avoid running afoul of the law and spending the rest of his days in a jail cell.

From the prospective of his attorneys, to the likely disbelief of the prosecution, court, victims and perhaps public, Mr. Syring is kind, considerate, thoughtful and *anything but confrontational*. He is appreciative of the work done on his behalf, he is pleasant and respectful with attorneys and staff of all races and religious backgrounds. His defense team is unaware of any negative interactions Mr. Syring has had with middle eastern neighbors and he does not appear to communicate his inflammatory and hurtful rhetoric directly to anyone he might take issue with apart from individuals who write or participate in public advocacy or occupy public positions. For that, and despite his vile comments, it does appear Mr. Syring is fighting a political war and not a personal or physical one.

Undersigned counsel's observations also appear to be in line with the impressions of the several psychologists who have evaluated Mr. Syring over the years. Most recently, Dr. Michael Hendricks has confirmed that Mr. Syring does not appear to be a threat to anyone. *See* Exhibit 1 (July 23, 2019) (Forensic Psychological Evaluation) (provided Under Seal) at 7 and 8 ("…it appears very unlikely that Mr. Syring poses a physical threat to anyone."). Moreover, as Dr. Hendricks noted (*id* at 7), and as became clear at trial, in the entire 12+ years that Mr. Syring has

been sending messages to AAI, he has never approached or confronted a single employee in person and has never appeared at an AAI event or at the AAI office.

### c. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Mr. Syring understands and accepts that he must suffer the consequences of the jury's verdict. He also understands the fact that in the government's and the Court's view, he is a repeat offender who admitted his words violated the law and then turned around and uttered them again. It is recognition of that very fact that has led Mr. Syring to recommend a sentence that is 3 times longer than the one he served in 2008.

### d. Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Future Crimes of the Defendant

While there is no evidence to suggest that Mr. Syring would attempt to hurt anyone, there is similarly no reason to believe that he will abandon his strongly held beliefs that motivate his email correspondence. The bigger question for the future, however, is not whether he will continue to believe what he does, but whether he will conform the communication of those beliefs to comport with the law. The fact that a jury has now delivered the message that his actions violated the law establishes that he must. Indeed, the jury's verdict has made clear to Mr. Syring that any hope or belief on his part that his peers would see things his way is now gone.

Of course, we recognize that, even if he were to promise he had learned his lesson this time around, those words would rightfully ring hollow given his prior conviction and allocution. For that reason, the Court's sentence must reflect the need to deter Mr. Syring from committing future violations of the law. A period of 3 years in the custody of the Bureau of Prison, followed by a substantial period of supervision, should ensure that Mr. Syring gets the message once and for all. And, under our proposed sentence, the Court will continue to have Mr. Syring under its supervision

for years after his release from incarceration in order to determine whether he has learned his lesson and is abiding by the law.[9]  Moreover, the Court would be free to completely restrict Mr. Syring's communications to certain persons or in certain circumstances.

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct.  The unique combination of motivation and circumstance that lead otherwise law-abiding citizens to risk prosecution and imprisonment are not so easily overcome by the simple imposition of lengthy sentences.  While such a theory might be appealing on its face, the reality is that there is little to no difference in the deterrent effect between probation and imprisonment.[10]  Moreover, there is a moral limit on the extent to which the need for general deterrence can or should be heaped on the shoulders of one person.[11]  Nevertheless, a 3-year period of incarceration followed by a significant term of probation and supervised release will send a strong message to others that for all that the First Amendment allows, there is a line that cannot be crossed without severe consequences.

---

[9] It is Mr. Syring's understanding that by sentencing him to serve 5 years' probation on the misdemeanor counts, Mr. Syring will be on probation for 5 years from the date he is released from prison.  That will allow the Court to monitor Mr. Syring's compliance with any post-release terms of supervision beyond the maximum term of supervised release permitted on the felony counts, which is 3 years.

[10] See Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); see also Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

[11] See United States v. Meyers, 353 F. Supp. 2d 1026, 1029 n. 1 (S.D. Iowa 2005) ("…the weight of society's need to send a message to potential wrongdoers can only be borne to a limited extent by one individual."); see also Paul H. Robinson, Distributive Principles of Criminal Law, at 223 (2008) (noting potential ethical objection to overemphasis on general deterrence, which "relies on treating the person being punished as a mere instrument by which to influence the conduct of others").

### e. The Need to Avoid Unwarranted Sentencing Disparity

Mr. Syring submits that his requested sentence is in line with other sentences imposed in somewhat similar circumstances. While there are rarely two cases that present identical factual scenarios, there have been some recent cases that share factual similarities to Mr. Syring's in that the defendants had been found guilty of sending threatening communications after having previously been convicted for similar conduct.

In *United States v. Ronald DeRisi*, Case No. 2:19-cr-00090 (E.D.N.Y. 2019), the defendant pled guilty to threatening to kill two U.S. Senators over their support for Justice Brett Kavanaugh's nomination to the U.S. Supreme Court. According to documents filed in his case, DeRisi had left numerous voicemails making reference to a 9mm bullet delivered "to the side of the head" and calling one of the Senators a "dead man." See Dkt. #32 (Government Sentencing Memorandum). Law enforcement also recovered 9mm ammunition at the time of his arrest. At the request of his defense counsel, DeRisi was evaluated and found to be competent to stand trial. He ultimately pled guilty and stipulated to a Guidelines range of 27-33 months. According to court documents, DeRisi had an extensive criminal history that included "five prior convictions for harassment/aggravated harassment dating back to 1984…." *Id.* at 6. The Honorable Joseph F. Bianco sentenced DeRisi to serve 18 months in prison.

In *United States v. Tyler Chance Bateman*, Case No. 3:18-cr-00042 (D. Alaska 2019), the defendant was found guilty by a jury of threatening to harm seven victims "with ricin, pipe bombs, gas grenades and a firearm." *See* Dkt. # 91 at 2 (Government Sentencing Memorandum). He was also convicted of threatening to commit an assault on a retail store and the families of several police officers. *Id.* In the months leading up to his trial, Bateman mailed a letter to the Assistant United States Attorney prosecuting the case "that included an implicit threat to carry out his threats

after serving his sentence." *Id*. at 3.  Shortly after his conviction, Bateman sent another letter to the prosecutor, who he had been ordered not to contact, and "referred, again, to finding the assigned prosecutor's home address, speculated that the prosecutor could be related to a victim whom the defendant formerly stalked, and wrote that the prosecutor is 'the only thing stopping' him from achieving his life goals." *Id*. (internal citations to the trial record omitted).  It appears the defendant had a history of domestic violence and threat/harassment convictions none of which resulted in substantial incarceration but placed him in criminal history category III.  *Id*. at 4; *see also* Dkt. #93 at 10 (Defendant's Sentencing Memorandum).  The PSR recommended a Guidelines range of 51-63 months and the Honorable Timothy M. Burgess sentenced him to serve 48 months in prison.

While we recognize that there are a number of considerations this Court must make in determining Mr. Syring's sentence, the cases cited above demonstrate that his request for a sentence that includes 3 years of incarceration is in line with sentences imposed on other defendants in somewhat similar circumstances.  Clearly there are differences as well, some of which weigh in Mr. Syring's favor (no explicit threats, no history of violence, no possession of weapons or ammunition) and others that do not (prior conviction and sentence for similar communications to same victim).  Nevertheless, Mr. Syring provides these cases not to suggest that they compel any single result but to make the Court aware of where his proposed sentence falls within the realm of sentences imposed in other relevant cases.

## CONCLUSION

For the reasons stated, Mr. Syring respectfully requests that this Honorable Court impose a sentence of 3 years' incarceration, followed by 5 years' probation and 3 years supervised release.

Dated: August 9, 2019

Respectfully submitted,

WILLIAM PATRICK SYRING
By Counsel


/s/ *Stuart A. Sears*
Stuart A. Sears (D.C. Bar No. 977144)
/s/ *Joseph A. Gonzalez*
Joseph A. Gonzalez (D.C. Bar No. 995057)
*Counsel for William Patrick Syring*
SCHERTLER & ONORATO, LLP
901 New York Avenue, NW
Suite 500
Washington, D.C. 20001
Ph: 202-628-4199
Fax: 202-628-4177
ssears@schertlerlaw.com
jgonzalez@schertlerlaw.com